## THE KENNEBEC.

### SEABOARD & GULF S. S. CO. v. BALTIMORE DRY DOCKS & SHIP BUILDING CO.

(Circuit Court of Appeals, Fourth Circuit. April 1, 1919.)

### No. 1678.

WHARVES ⬡⟹20(1)—DRY DOCKS—LIABILITY FOR INJURIES TO VESSELS UNDER REPAIR.

A dry dock company, employed to make repairs to the exterior of the hull of a steamship, *held* not required to furnish steam for heating the interior while the work was being done, nor liable for injury caused by freezing of the steam pipes, where the master and crew remained on board and in charge.

Appeal from the District Court of the United States for the District of Maryland, at Baltimore; John C. Rose, Judge.

Suit in admiralty by the Baltimore Dry Docks & Ship Building Company against the steamship Kennebec; the Seaboard & Gulf Steamship Company, claimant and cross-libelant. Decree for libelant, and claimant appeals. Affirmed.

For opinion below, see 252 Fed. 194.

Milton Roberts and Clifton S. Brown, both of Baltimore, Md. (Daniel H. Hayne, of Baltimore, Md., on the brief), for appellant.

L. Vernon Miller and George Weems Williams, both of Baltimore, Md., for appellee.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

KNAPP, Circuit Judge. The Baltimore Dry Docks & Ship Building Company, appellee here, libeled the steamship Kennebec for a repair bill of $2,988.90, and thereupon her owner filed a cross-bill for damages to the amount of some $23,000 for alleged neglect of duty, as will presently be stated, of which $4,329.65 was for direct injury

to the machinery of the vessel and the balance in the nature of demurrage. On the trial the correctness of the repair bill was admitted, and the cause proceeded on the allegations of the cross-bill. The decree appealed from dismissed the cross-bill and gave the libelant judgment for the amount of its claim.

The steamship was taken from the plant of the W. S. Cahill Company to the dry dock of appellee in Baltimore Harbor between 5 and 6 o'clock in the afternoon of December 27, 1917, for the purpose of having some work done on her hull. Prior to this she had been discharging sulphur at the Canton ore dock, and at the same time undergoing annual inspection by the steamship inspectors. While at Canton fires were drawn to permit the Cahill Company to repair her boilers, and that company supplied heat to the vessel from an electric welding plant moored alongside. Upon completion of the discharge of cargo at Canton the ship was moved to the Cahill plant for further repairs, to enable her to pass inspection; and while there a steam line was run from the plant's boiler to her deck line for heating purposes.

The Kennebec remained in appellee's dry dock until the work which it had undertaken to do was completed, which was some time on the 30th, when she returned to the Cahill plant. During that time the weather became extremely cold, and as the vessel was without heat some of her steam pipes and other apparatus bursted from freezing, causing the damage in question. The dock company is sought to be held liable on the theory of neglect of duty to furnish sufficient steam to prevent the damage, which is claimed to have been requested by the ship's captain. The dock company denies that any such request was made, or that it was otherwise under any obligation to protect the machinery from freezing.

To this brief outline is added the following from the opinion of the court below, which we accept as a fair and correct deduction from the testimony:

"The day after the ship arrived at the dry docks it was comparatively mild, the thermometer rising to about 40 degrees. At that temperature the pipes were in no danger, but the living quarters upon an unheated ship were very uncomfortable. Accordingly, in the forenoon of that day, the captain of the ship asked the superintendent of the dry docks to furnish steam, saying, unless he had it, he feared he could not keep his crew. He now thinks he had also in mind the protection of the pipes against the possibility of a cold wave. If he had, he kept it to himself, and said nothing to the dry docks superintendent about it. It would have been quite troublesome and inconvenient for the latter at that time to have furnished steam. I doubt not that it could have been done at a price, but it did not seem worth while, for the mere purpose of retaining the crew on board, instead of sending them to a boarding house on shore. Moreover, the superintendent then supposed that the repairs to the ship could be finished in 24 hours, or thereabouts, and that elaborate arrangements for so brief a time were unnecessary and so told the captain.

"In consequence of the refusal to furnish steam an application was subsequently made to the dry docks for oil stoves for the crew's quarters. It so happened that there were none available. When the engineer of the ship learned that steam would not be furnished, he had the pipes drained, so far as that could be done without breaking connections and taking apart certain portions of the machinery. To have done everything necessary to get all the water out of the pipes would have taken, with the force he had at hand, 24 hours and perhaps more. At least that much time would have been required to have put them back so that the engines could be operated.

"As the dry docks went on with the work, it perhaps found there was more to be done in the way of repairs than had originally been apparent, and for that or some other reason the work was not finished until December 30th. During the night of December 28th the temperature fell rapidly, and on the 29th and 30th went down nearly to zero. On the morning of the last-named day, it was discovered that the water left in the pipes and engines had frozen, and that the damage for which the ship seeks to recover by its cross-libel had been done."

It thus appears that whatever request for heat may have been made the dock company at once refused, and the captain without protest took measures accordingly. If, therefore, the dock company was under any obligation it was an obligation, not of contract, but imposed by law because of the relationship of the parties. Appellant says the law of bailment applies, and cites cases illustrating its familiar principles. But an essential element of bailment is delivery of possession to the bailee, and we think it plain that there was no such delivery in this case. The work undertaken by appellee was confined to the exterior of the hull, and had nothing to do with any other part of the vessel. The captain continued in command, and he and the crew stayed on board. In every substantial sense the ship remained in the control of her master, and the dock company certainly did nothing to interfere with that control, or to prevent him from doing whatever he thought necessary to protect the machinery of the vessel. The doctrine of ordinary care of a bailee has no application.

Moreover, it is not shown that the dry dock company was accustomed to furnish steam to vessels in its docks, or that it held itself out as prepared to furnish steam in cold weather. On the contrary, the record shows that it did so only for government vessels, when the contract for repairs contained such a provision. In short, there appears to us no aspect of the facts under which the dock company can be charged with liability for what happened to the pipes and machinery of the steamship.

The case was correctly decided by the trial court, and its decree must be affirmed.